HINES, administratrix, v. JOHNSTON, executrix.

1. Where three persons agreed in writing that certain land should be purchased for sale, two of them advancing the purchase money and taking title in their own names, and the third rendering professional services without charge, he to have no interest until enough of the land was sold to repay the purchase money with interest, and the three to share equally in the residue or in the proceeds of all subsequent sales, the beneficial ownership in the excess of the land bought under the agreement, over and above what was required to repay the purchase money and interest, was in the three jointly, the two in whom the legal title was vested holding in trust for the third as to his share. If this third person, who had died, in fact rendered before his death all the services which were required of him by the contract, the share of his estate would be a full third. If not, the questions whether that share should be reduced, and if so, how much, and if reduced at all, whether the deduction should be made on the basis of charging that share with any costs or expenses incurred because of the non-performance of services, or the deduction should be arrived at upon an equitable apportionment, would be open for determination. It matters not that the land was held for sale even for as long a period as thirty-five or forty years, there would be no bar of the equitable interest covered by the trust, either by the statute of limitations or by the equitable doctrine of stale demand.
2. Where it appeared that the maker of a bond for titles had complied with the condition thereof, the presumption, in the absence of any proof on the subject, is that the bond was returned to him; and he having died, and his executrix having failed, on proper notice, to produce the bond upon the trial of an action to which she was party defendant as such executrix, the foundation was laid for the admission of secondary evidence of the contents of the bond.
3. A witness who was neither the clerk of the superior court nor his deputy was, over an objection that he was not the legal custodian of the records of that court, competent to testify that he had examined the records of deeds in that court, and that no deeds of such and such import appeared on those records.
4. It was error, upon the substantial merits of the case, to grant a nonsuit. At the next trial any equities between the parties, upon which no express ruling is now made, may be considered and adjusted.

February 27, 1895.

Complaint. Before Judge HARDEMAN. Bibb superior court. April term, 1894.

On April 16, 1889, the administrator of R. K. Hines sued the executrix of W. B. Johnston, alleging: Johnston on June 20, 1850, together with the firm of Scott, Carhart & Company, entered into a written agreement with Hines, that the parties thereto should purchase lands therein mentioned, for the purpose of laying the same off into town lots and selling them for the joint benefit of said parties. The purchase money was paid, and the deeds to the property were drawn by Hines, as stipulated in the agreement, who also examined the titles to the property and transacted all the legal business growing out of said agreement. The property purchased under the agreement originally consisted of about $92\frac{1}{2}$ acres, and is described in the deeds executed by John Powers, H. B. Troutman and others, who were the owners thereof, to Johnston and Scott, Carhart & Company. Said property is now known as Huguenin Heights, and has been laid off into town lots. In execution of said agreement the property so purchased was laid off into town lots in the lifetime of Hines, and was held under the agreement, and six lots on the northwest corner of the same were sold off during the lifetime of Hines to Scattergood, titles being executed by Johnston and Scott, Carhart & Company and the conveyance being drawn by said Hines. Hines rendered all the professional and legal services that grew out of the subsequent transactions, and always stood ready to perform, and always did such services without charges to the other parties, and in all other respects fully complied with his agreements. The property so purchased, although it had been laid off into town lots for sale and although petitioner has repeatedly urged Johnston to carry the agreement into execution by selling said lots, remained unsold until 1887, when Johnston, who in the meantime had become the purchaser of the interest of Scott, Carhart & Company, sold all the property, except

the six lots above mentioned, to a syndicate composed of Coleman *et al.*, for $65,000, the lands being sold as an entire tract and at one sale and not as contemplated in said agreement. The amount advanced by Johnston and Scott, Carhart & Company for the purchase of the land was $2,500, on the dates of the deeds from Powers, Troutman and others, and they received in part payment thereof the full amount of the purchase money paid for the six lots sold to Scattergood, $480. Johnston was not entitled to charge interest on the amount of the purchase money remaining due after crediting said payment, because for many years he refused to sell the land and carry out the agreement; but if so entitled, petitioner should recover from defendant one third of the $65,000, besides interest, less the amount above set forth. By a second count it is alleged, that under the agreement it was provided that the land should be sold as town lots; that separately sold they were reasonably worth $150,-000, which sum should have been realized from the property if it had been sold as town lots; that the sale in an entire tract was a breach of the agreement by Johnston; and that defendant is liable to petitioner a third of said sum of $150,000, less the net amount advanced for the purchase money.

In evidence was the agreement referred to, dated June 20, 1850, between Johnston of the one part, Scott, Carhart & Company of the second part, and R. K. Hines of the third part, and stating that it is agreed by all the parties to purchase "certain lands now owned by John Powers, Hiram B. Troutman and others, in the Macon reserve west of the Ocmulgee river, for the purpose of laying the same off into town lots and selling them for the joint benefit of the parties"; that Johnston and Scott, Carhart & Company are to advance the money necessary for the purchase of the lots equally between them, and the titles are to be made to them; that Hines

shall draw all such conveyances and do whatever professional or legal business may grow out of this transaction, without charge to the parties; that the amount of the money thus advanced by Johnston and Scott, Carhart & Company for the purchase of the lands and for incidental expenses in carrying out this agreement, with interest thereon at seven per cent. per annum, is to be first retained and refunded to Johnston and Scott, Carhart & Company, and as soon as the same shall be received from the sale of the lands, and that the balance be equally divided between the parties to this agreement, that is to say that Johnston is to draw one third of the net proceeds, Scott, Carhart & Company one third, and Hines one third; that Johnston and Scott, Carhart & Company will hold the lands subject to this agreement, and from time to time, and as often as may be decided upon by any two of the parties to this agreement, will sell and convey the same to the purchaser thereof for such price or prices, and after such notice of the sale, as may be agreed upon; and that on the part of Hines it is agreed that he is to have no interest in the lands until the purchase money, incidental expenses and interest as above provided, are paid and refunded to Johnston and Scott, Carhart & Company, when he is to be entitled to one third of the remaining lands or the proceeds of the sale of them as before expressed.

Plaintiff introduced also, deed from Troutman to Johnston and Scott, Carhart & Company, dated June 26, 1851, consideration $1,500, conveying: "all those lots or parcels of land situate and being in the Macon reserve west of the Ocmulgee river in the county and State aforesaid, known and distinguished in the plan of said reserve as ten-acre lot number 2 and twenty-acre lot number 2, save what was sold off of the twenty-acre lot number 2 by Alexander Shotwell to John H. Oldershaw not to exceed 3 acres, leaving 27 acres in said last

mentioned lots, more or less; also all that part and so much only of fraction number 21 and of ten-acre lot number 3 heretofore purchased by the said Hiram B. Troutman from the administrator of John Rawls deceased, as lies southwest of the southwest line of the Macon & Western railroad, and reserving all of the balance of said last mentioned fraction, and not lying north of the northeast line of said Macon & Western railroad." Also, deed from John Powers to Johnston and Scott, Carhart & Company, dated June 20, 1850, consideration $1,000, conveying: "the several lots of land . . in the Macon reserve west of the Ocmulgee river, county of Bibb in said State, and known and distinguished in the plan of said reserve as lot number 15, containing four acres more or less, part of ten-acre lot number 1, supposed to be eight acres, and the southeast half of twenty-acre lot number one, supposed to be a fraction less than ten acres, being all those parts of the two last mentioned lots as north of the road from the city of Macon to Columbus, adjoining the common of the city of Macon and lands now owned by Watkins Day, Cherry, Fitzpatrick, Napier and others, and together containing 21½ acres more or less, reserving one acre to be laid off in the southwest corner of the southeast half of the twenty-acre lot number one, which the said Powers has sold to a man by the name of Brice," etc. Also, deed from Isaac Scott to W. B. Johnston, dated March 23, 1855, consideration $675, conveying three sixteenths undivided interest in the land described as a " certain tract of land known and distinguished as the town of New Macon, laid off and described as per map hereunto annexed, containing 60 lots, saving and reserving or excepting lots numbers 55, 56, 57, 58, which have been previously sold to Findlay & Scattergood." Also, deed from J. D. and W. B. Carhart to T. R. Bloom, dated January 20, 1860, conveying five sixteenths undivided interest in

above described lands, consideration $1,562. Also, deed
from Bloom to Burton, dated February 3, 1864, convey-
ing four sixteenths undivided interest in said lands, con-
sideration $1,625. Also, deed from Burton to W. B.
Johnston, dated August 24, 1869, conveying four six-
teenths undivided interest in said lands, consideration
$1,200. Also, deed from Gustin, administrator of Bloom,
to Johnston, dated February 3, 1870, conveying one six-
teenth undivided interest in said lands, consideration
$400. The deeds from Scott to Johnston, and the other
deeds mentioned after that deed, were produced by de-
fendant under notice. The map referred to in said deeds
was not produced. Plaintiff also introduced back deeds
in the chain of title to Troutman and Powers, for the
purpose of identifying lands with those described in the
agreement. Also, a map of Huguenin Heights, made
by Pew, a civil engineer, having indicated upon it the
portions of Huguenin Heights described in the deeds
from Troutman and from Powers to Johnston and Scott,
Carhart & Company; and the map of the Huguenin
Heights property, recorded in the office of the clerk of
the superior court of Bibb county. Also, much evidence
as to what portions and how much of the lands conveyed
by Troutman and Powers to Johnston and Scott, Car-
hart & Company were contained in the Huguenin Heights
property, or that part of said property sold by Johnston
to the syndicate; which tended to show that the portion
of the Huguenin Heights conveyed by Johnston to the
syndicate, covered by the Troutman and Powers deeds,
was about 45 acres. Also, bond for title from Johnston
to Coleman and others (the syndicate, composed of
twelve persons), dated March 16, 1887. This bond de-
scribes the property, as all that tract adjoining and near
the city of Macon, being north of the Columbus road
and known in a survey made for Johnston by Dubois in
June, 1867, as New Macon, a map of which is attached

as part of this bond, containing 50 acres more or less, excepting the property shown in said map as having been conveyed to a Baptist church; and it being agreed that this bond was made for the conveyance of the whole tract according to its outside boundaries as shown by said map, and not with reference to the streets, alleys and divisions in the lots shown thereon, etc. The bond stated that each of the obligees had, on March 16, 1887, paid to Johnston $416.66⅔, aggregating $5,000, and had also executed and delivered to him his two certain promissory notes, one of each party, being for the sum of $2,916.66⅔, making the sum of $35,000 and due 12 months after date, and one of each party for $1,666.66⅔ due two years after date, the aggregate of said notes being $20,000, etc. Also, deed dated October 3, 1887, from defendant, executrix of W. B. Johnston, to S. R. Jaques and T. D. Tinsley, reciting the making of the above bond for titles to the lands therein described, "said lands being called the Huguenin Heights, a map of which has been duly recorded in the office of the clerk of the superior court, which map was made part of this deed (being the map before mentioned as the recorded map of Huguenin Heights). The deed further stated that the terms of the bond had been complied with and the purchase money had been paid, and the parties to the bond or their assigns had portioned out the lots among themselves and requested deeds made to themselves each for his own lot, etc.; and conveyed to Jaques and Tinsley certain named lots. The agreement between Johnston, Scott, Carhart & Company and Hines, and the deeds from Troutman and Powers to Johnston and Scott, Carhart & Company remained in the custody of Hines until his death, January 27, 1852, and afterwards in the custody of his son, the plaintiff, until they were obtained from plaintiff by attorneys for members of the syndicate in drawing necessary papers, and were afterwards

returned to him. Johnston referred said attorneys to plaintiff to get part of the deeds to the lands. Johnston and his executrix received, as the net amount from the sale made by him to the syndicate, $48,900. Johnston stated to one of the attorneys representing the syndicate that plaintiff had "those papers"; and that at one time plaintiff's father had some interest or some connection "with this matter," but now he had no interest in it. Just before the bond for titles from Johnston to the syndicate was signed, there was some trouble about the deeds, two of them were not on record, and a witness heard part of a conversation between plaintiff and Johnston: Johnston came to plaintiff's office and asked him for "those deeds"; plaintiff said, "You are old and you cannot live long; you had better settle with me; it will be easier for you to settle with me than your administrator." Witness found he was hearing a conversation he should not hear, and retired; did not recollect what Johnston said, but thought Johnston didn't seem to like plaintiff's saying that, and that Johnston got up and left; did not see plaintiff give him any deeds. Johnston died in 1887. The deeds from Powers and Troutman to Johnston and Scott, Carhart & Company, and the agreement sued on, are in the handwriting of Hines. These papers and the deeds showing the chain of title into Troutman and Powers were found by plaintiff among his father's private papers, and were all in a package marked "New Macon." There was no former administration on the estate of Hines, though application was made for letters of administration by the uncle of plaintiff and bond was given, but if there was any order appointing said uncle, it was never carried out. There was nothing to administer, the estate of Hines not being solvent. J. J. Hines was the surviving member of the firm of R. K. & J. J. Hines, and wound up the business. The property covered by the map of New Macon

was the property in litigation, as plaintiff recollected it, and he thought an additional part of what is called lot 21. New Macon was laid out. into town lots, a regular map and streets; but Huguenin Heights embraces some land which was not embraced in New Macon. One Stowe probably had an interest in the firm of Scott, Carhart & Company. He died about 1855. Isaac Scott has been dead fifteen or twenty years. J. D. Carhart was living in 1874, but probably died two or three years afterwards. W. B. Carhart lived in Macon till about 1865, when he moved to New York where plaintiff saw him in 1866, and he. was then a very old man. The first improvements placed upon the property in dispute from the time of the purchase under the agreement of 1850 up to the present time, were after the sale to the syndicate; it was not in cultivation and was vacant land so far as plaintiff knows, who was watching it very diligently. Plaintiff has been in Macon a great deal between 1849 and 1874, is a lawyer, has had large dealings in real estate; and gave his opinion as to the probable values of the Huguenin Heights property, if it had been laid out in lots and streets and put upon the market, at various times, estimating it at large sums, about $9,000 in 1855, $25,000 in 1870, the same in 1873, etc. Hines left nine children, the youngest of whom was about seven years old when he died. All of them reached majority. In 1866 they were all of age and living, except one who died in 1865 or 1866. When Hines died he left a considerable estate, but was liable as indorser on some old executions, and the estate was sold, probably to pay those debts. As long as he was living his family got the benefit of his law practice, and he could pay his debts. Plaintiff knew nothing about his being indebted to W. B. Johnston subsequent to the date of this transaction and before. He was considered a fine conveyancing and "title" lawyer. In 1860 Scott, Carhart &

Company had become wealthy men. W. B. Carhart was supposed to be the wealthiest of them all. Since 1850 no taxes have been paid on the property in question, by any one interested in the estate of Hines. Hines was well acquainted with the values of land. Plaintiff qualified as temporary administrator upon his father's estate about a month before this suit was brought.

The court granted a nonsuit. To this ruling, and to certain rulings excluding evidence (the facts as to which are sufficiently apparent from the opinion), the plaintiff excepted. He having died pending the case in the Supreme Court, the administratrix *de bonis non* of R. K. Hines was made a party plaintiff in error.

HILL, HARRIS & BIRCH, HARDEMAN, DAVIS & TURNER, W. B. WILLINGHAM and O. A. PARK, for plaintiff.

BACON & MILLER, ANDERSON & ANDERSON and W. H. FELTON, Jr., for defendant.

ATKINSON, Justice.

The facts in this case are stated with sufficient fullness and accuracy in the official report.

1. According to the view we take of the contract entered into between the original persons under whom the parties to this case respectively claim, and which is the basis of the plaintiff's alleged cause of action, the rights of the plaintiff's intestate with respect to the subject-matter of the contract were not concluded by his death. If we were at liberty to treat it as a simple contract of hiring, by which, for a stipulated sum to be paid, the plaintiff's intestate undertook to perform a particular stipulated service, which was itself entire and indivisible, it would have fallen squarely within the terms of section 2547 of the code, and squarely within the principle announced in the case of Cutter *v.* Powell, cited in vol. 2 of Smith's Leading cases, p. 1 (2d Law Library ed.), and which was pressed upon us with great

earnestness by the able counsel who appeared for the defendant in error. But a careful consideration of the terms of this agreement will not, in our opinion, justify us in placing upon it such a construction. In the first place, Scott, Carhart & Co. and W. B. Johnston, the other two parties to the contract, were not engaged in an independent speculation, nor did they employ Hines for the performance of any particular duty in connection with such a venture; but on the contrary the three made this mutual agreement, according to the terms of which Scott, Carhart & Co. and W. B. Johnston were to contribute certain specified sums of money; and as against such moneys, Hines was to contribute his services as a lawyer. The purpose designed to be accomplished by this agreement and this contrivance between them was to form a company for the purchase of certain lands, with the understanding that the legal title, for some reason undisclosed in the record, was to be vested in Scott, Carhart & Co. and W. B. Johnston, they agreeing to hold the same to the joint use of the three parties to the agreement. Scott, Carhart & Co. and Johnston undertook upon their part to sell the land, and after the payment to them of the money advanced, with interest, the profits resulting from the joint venture would be equally divided between the three parties thereto. In the concluding paragraph of the agreement, it is stipulated that Hines is to have no interest in the lands until a sufficiency thereof has been sold to repay the moneys advanced by Scott, Carhart & Co. and Johnston for the purchase money of the land, but eo instanti with this, he was to take a vested interest in the land itself. In other words, in order to insure to them the repayment of the purchase money, they took to themselves the legal title, with a power of sale for the purpose of reimbursement, saving the equity of Hines, and according to him the right to share in the profits. The reason

for this precaution may be found in the circumstance that at the time this transaction occurred and this deed was executed, it appears that Hines was involved, laboring under serious pecuniary embarrassment, and it is entirely probable that his co-contractors were unwilling to hazard their money by taking the title in such shape as would invest him with a legal interest which would be subject to levy and sale for the satisfaction of his debts. At all events, by whatever motive they were influenced, the conveyance was so drawn as that Hines could acquire a legal title to a given interest in the property only when a sufficiency thereof was sold to extinguish the advancement thereon made by his co-contractors. It will be observed that in the fifth paragraph of the agreement, in stating Hines' situation with reference to the land, the following language is employed: "It is agreed that he is to have no interest in said lands until the purchase money is paid." His, therefore, was a contingent interest in the land itself, but a vested interest in the ultimate profits which would result from the joint venture. Without having the legal title, he had a property in the thing itself. He was a joint purchaser with Scott, Carhart & Co. and Johnston, and the mere failure to take the legal title in him as a joint tenant could not deprive him of his equitable interest in the profits which might ultimately result from the joint venture. His death, therefore, could not have destroyed his interest in this venture. The very purpose of the parties, as expressed in this agreement, was that they would hold the land for speculative purposes. The initial steps were taken and the enterprise completed when the purchase was made and title to the property acquired by the parties. Up to that point, according to the evidence in the case, Hines performed all that was required of him, and all that was necessary to the completion of his contract. He had so far performed it as to vest in him

a perfect equity to a one third interest in the ultimate profits of the joint venture; he had so far performed it as to vest in him a title to one third of the land itself when his co-contractors should exercise the power of sale which was conferred upon them by the agreement between the parties.  It appears that Hines, shortly after this was done, died; that Scott, Carhart & Co., years afterward, sold a half undivided interest in these lands to other parties, who in turn sold to Johnston ; but at no time was there ever a sufficiency of the land sold by Johnston and Scott, Carhart & Co., or by Johnston himself after he acquired the entire interest of Scott, Carhart & Co., to reimburse them or him for the money laid out and expended in the purchase of the property.   This suit was not brought until 1889, and it is earnestly insisted by counsel for the defendant in error, that, admitting even that Hines had at one time an interest in the premises or in the proceeds from the sale of them, if not barred by law, it was a stale demand, and that the courts would interpose an equitable bar to the prosecution of the right.   It was urged that it was within the power of Hines, if he had an interest, to compel a sale.   We do not think that these contentions are well founded. The land was bought for speculative purposes.   Subsequent developments show that it was a wise investment. Johnston, as well as Scott, Carhart & Co., awaited the great increase in value which their keen foresight had anticipated.   It was the right of Hines, and those holding under him, likewise to await the rise in value and reap the profit of this ancient investment.     This claim was neither stale, nor was it barred by any statute of limitations of which we are advised.   Johnston held the power of sale, and until he saw proper to exercise that power and realize sufficient money to repay the original purchase money for the land, it was not incumbent upon Hines to demand an accounting.   Hines was not, in

strict law, a cotenant; therefore could not demand a partition of the premises; and no claim even of actual possession on the part of Johnston could have defeated Hines' title, for the reason that because of the act of Johnston his title would not then have accrued. For the same reason he could not have sued for an interest in the profits, because, as the land remained as an entirety unsold until a short time before this suit was brought, no moneys ever came into the hands of Johnston arising from the sale of the land, in which Hines or his heirs would have been entitled to participate as a part of the profits of the joint venture. Until such a time, they would have had no right to an accounting at the hands of Johnston or his privies in estate. No statute of limitations began to run until the accrual of a cause of action, and inasmuch as this suit was brought within the statute after the accrual of a right of action, it cannot, in any just sense, be impeached as stale. So far as Johnston was concerned, there was never any breach of duty upon his part towards Hines until after the sale of the land and his refusal to account. We think the evidence introduced upon the trial of the case, under the views we have before expressed, makes out a cause of action in favor of this plaintiff. Whether or not she shall be entitled to recover a full one third interest in the profits resulting from the sale of this land, we do not undertake now to decide. If Hines before his death rendered all the service which was required of him by the contract, the share of his estate would be a full third. If he had not performed all the service required of him at the time of his death, the questions as to whether that share should be reduced, and if so, how much, and if reduced at all, whether the deduction should be made on the basis of charging that share with any costs or expenses incurred because of the non-performance of services, or the deduction should be arrived at upon an equitable ap-

portionment of such costs according to the amount of additional trouble and expense incurred by Johnston in and about the negotiation and consummation of the sale of the property, are questions for future determination when the cause shall be tried again in the superior court.

2. Upon the trial of the case, it appeared that Johnston had executed a bond for titles in favor of the persons to whom he had sold the premises for and on account of which this suit was brought. After the execution of the bond for titles, Johnston died, and thereafter his executrix, the defendant in the present case, made deeds to the premises described in the bond, in favor of the obligees therein named, in one of which it was recited that the terms of the bond having been complied with, and the purchase money having been paid, and the parties to the bond, or their assigns, having apportioned out the lots among themselves and requested that deeds be made each for his own lot, etc. A notice was served upon the executrix requiring her to produce, to be used as evidence for the plaintiff, the bond for titles referred to in such deeds. She answered that the bond for titles was not in her power, possession, custody or control. The plaintiff then offered secondary evidence of its contents, which was repelled by the court, upon the objection of defendant's counsel that the proper foundation had not been laid for the introduction thereof, they insisting that to authorize the introduction of secondary evidence of the contents of this bond for titles, the original paper must be shown not to be in the power, possession, custody or control of the obligees in the bond. We do not think this secondary evidence should have been excluded. This bond had performed the office for which it was designed by the obligor. In accordance with its terms, his executrix had made the deeds which he undertook to execute. The bond itself being performed

and the purchase money paid, the presumption is that it was redelivered to his executrix. At all events, she was the legal custodian of this paper, and when notice was served upon her to produce it and she was unable to find it among the papers of her intestate or her own, the presumption arose that it had been destroyed. Upon the strength of this presumption, in the absence of the bond itself, secondary evidence of its contents was admissible, and the court erred in excluding it.

3. At the trial, the plaintiff undertook to show by a witness, other than the keeper of the records, that he had examined the public records of the county of Bibb, and that upon such records there was no evidence of a conveyance of certain premises involved in this controversy. It was objected that such witness was incompetent to testify to the absence of anything from a public record; that this could be proven only by the keeper of the records himself. The objection was sustained, and the testimony excluded. If the testimony were otherwise relevant, we think the court erred in excluding it upon the objection taken. Official character does not give to any person exclusive competency to testify to any matter concerning which the public or any other person may be as well informed as he. Any witness who had read the records in the clerk's office would know as well as the clerk himself whether a particular deed was recorded there. If it was not so recorded, he could testify to such a fact as well as the clerk. But if, on the other hand, it was sought to show that a particular paper was recorded in the clerk's office, this fact could not be proven by any witness other than the clerk, nor by him except by a certified copy of such record under his hand and seal. The certificate of the clerk is sufficient to authenticate any record existing in his office; but his certificate to the fact that a particular record was not in his office would not be admissible evi-

dence.   In the latter case, any witness who knew the fact could testify to its truthfulness.   We think, therefore, the court should have admitted the evidence.

4. Upon the substantial merits of this case, a nonsuit should not have been awarded.   At the next trial, if there are any equities between the parties other than are suggested by the record now before us, they can and doubtless will be adjusted upon proper, legal and equitable principles.   From the earnest argument of the counsel who appeared for the defendant in error here, we are rather induced to the opinion that the circuit judge was influenced to the grant of this nonsuit by the conviction that this plaintiff's right of action was barred. We think in this our learned brother was in error, and that upon another trial a conclusion can be reached which will give full expression to all the legal and equitable rights of all the parties concerned.

Let the judgment of the court below be   *Reversed.*